UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
BECKY GARCIA and
ESTAVAN[1] B. GARCIA,
    Debtors.                                         No. 7-05-14383 SA

PHILIP J. MONTOYA,
    Plaintiff,

v.

TEODORO A. GARCIA and
ESTHER J. GARCIA,
    Defendants.                                    Adv. No. 06-1054 S

## MEMORANDUM OPINION AFTER TRIAL ON THE MERITS

This matter came before the Court for trial on the merits of Plaintiff's complaint to recover preferential or fraudulent transfer. The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F) and (H); and these are findings of fact and conclusions of law as required by Rule 7052 F.R.B.P. This chapter 7 case was filed prior to the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-08, 119 Stat. 23, and therefore the changes enacted by that legislation are not applicable to this case.

This adversary proceeding is an attempt by the Chapter 7 Trustee for Becky Garcia and Estevan Garcia ("Debtors") to

---

[1] Sic on the Debtor's petition (doc 1). Trial exhibits suggest the correct spelling is "Estevan". The Debtor signed the petition and schedules and his affidavit (doc 20) as "Steve".

recover a house from Estevan's parents Teodoro A[2]. and Esther J. Garcia ("Parents") as either a preferential transfer or a fraudulent transfer. The transfer of the house took place approximately 11 months before the bankruptcy was filed.

Debtors were married in 1995. At the time, Estevan owed approximately $19,000 to his ex-wife as part of their divorce settlement. Estevan's parents agreed to place a mortgage on their unencumbered home to help Estevan pay the debt. They followed through with this plan, although the record does not indicate when.

In February, 2000 Debtors wanted to consolidate their bills. Estevan approached Teodoro, who stated that he no longer wanted his name on any loans. Teodoro and the Debtors agreed, however, that Parents would convey their house to the Debtors so that the Debtors could obtain a mortgage on it in their names, with the proviso that the Debtors immediately deed the property back to the Parents. On February 23, 2000, Parents executed a warranty deed for the house to the Debtors. The deed was recorded two days later. The deed contained no restrictions. Debtors paid and Parents received no consideration for the deed.

The Debtors then attempted to get a mortgage in their names on the property. They were unable to qualify due to Estevan's

---

[2]Teodoro died on September 25, 2005. The record is silent as to whether there is or was a probate proceeding.
Page -2-

poor credit. Becky was able to qualify in her own name alone, however. On April 17, 2000, Debtors executed a sole and separate property agreement that conveyed Estevan's interest in the house to Becky. (Exhibit B-1). On April 21, 2000, Becky executed a mortgage to Greenpoint Mortgage Funding, Inc., borrowing $35,000. (Exhibit B-2). Exhibit B-3 is the closing statement which shows a payoff of $19,060 to First Security Bank (Parent's original mortgage taken to help Estevan), closing costs[3], payments to various credit card companies and a credit union, and $2,339 to Becky. Becky testified that she put this in Debtors' joint account and used it to pay bills. No funds went directly to Parents.

Debtors both testified that the property was to be deeded back to the Parents within two weeks of the mortgage closing. Becky believed she filled out a deed returning the house in connection with closing, but was unable to locate it. She also believed that it may never have been done.

Debtors have made all payments to Greenpoint Mortgage. Parents made no payments to Greenpoint Mortgage.

In mid-2004, Teodoro discovered that the house had never been deeded back per the agreement. He called Becky and told her

---

[3]Among the closing costs was a charge for County taxes on the property in the amount of $291.82. These are the only taxes Debtors ever paid on the property. Parents paid all other taxes.

Page -3-

she had to execute a deed. She was surprised that she still had title, and immediately executed a Quit Claim Deed to the Parents. This deed was recorded on July 14, 2004. The deed recites that it was for "Zero dollars" consideration.

In mid-July, 2004, Debtors were having trouble paying their bills; Estevan had suffered a stroke. Debtors were insolvent on the date the deed was recorded, with debts exceeding their assets.

Debtors filed their Chapter 7 case on May 30, 2005, within one year of the Quitclaim deed. Plaintiff was appointed Trustee and continues in that capacity.

At trial both Debtors testified, as did Esther Garcia. The Court found all witnesses to be truthful, forthcoming and credible. There were no inconsistencies between any of the testimony or between the testimony and the documents admitted into evidence.

Neither Debtor was contemplating bankruptcy in mid-July, 2004. Neither Debtor has ever claimed an ownership interest in the house, they never charged rent for its use, and they never paid for repairs, insurance or taxes (except as noted above). Debtors did not have the taxes assessed in their names, they did not receive the tax assessment notices and they did not receive the tax bills. Teodoro also never gave Debtors copies of the tax bills to pay.

Parents have continuously lived in the house for over 40 years.

Debtors did take a mortgage interest deduction on their 2004 tax return for interest paid to Greenpoint. (Exhibit P-7). They did not take a real estate tax deduction for the house, however.

Esther Garcia testified that she was 84 or 85 years old, had never been to school and does not read, write or speak English. She has lived in the property for over 40 years. She testified that she signed Exhibit A-3 (the 2000 Warranty deed to Debtors), but she could not read it and did not know what she was signing. Teodoro also did not explain it to her. Teodoro handled all the financial matters for the household. She had no idea she was deeding her home to the Debtors. She received no money for the deed. If she had known what she was signing, she would have refused. She and Teodoro had discussed their testamentary desires that the house should be distributed among their four living children upon the last of Parents to die; she never would have agreed to give it to just one child. She understood that Estevan had financial problems ever since his divorce, and understood that her husband helped him with money, but she did not understand that the house was ever involved.

Plaintiff argues that he has made out a prima facie case of either a fraudulent or preferential transfer. Defendant argues that there was not a transfer of an interest of the Debtors in

property because Debtors held only bare legal title to the house. Alternately, Defendant argues that the original Warranty deed in 2000 was ineffective to pass title because their was no intent to transfer an interest in the House. Plaintiff responds that it is improper to impose either resulting trusts or constructive trusts on a bankruptcy estate, and that neither trust theory is applicable in this case in any event. In response to the deed argument, Plaintiff claims that Debtors have failed to prove the deed was fraudulently obtained. In addition to their closing arguments, each side submitted thoughtful briefs (docs 18, 30, 31, 32 and 33), which the Court has considered.

## **CONCLUSIONS OF LAW**

First, the Court notes that this is not a case where a creditor is trying to impose a constructive or resulting trust on property in a bankruptcy estate. Rather, the position is that of a defendant in an avoidance action demonstrating that, had no bankruptcy been filed, the defendant would have been entitled to an equitable remedy in state court to have the property ordered returned. The asset is not in the estate and was never in the estate. The question, then, is would Parents have been entitled to a return of the property if Becky refused to deed it back. The Court finds that they would.

Decisions in bankruptcy cases concerning the doctrines of constructive or resulting trusts in bankruptcy cases are

determined by reference to state law.  See Taylor v. Rupp (In re Taylor), 133 F.3d 1336, 1341 (10th Cir.), cert. denied, Rupp v. Taylor, 525 U.S. 873 (1998)(Utah law governed whether resulting or constructive trust should be imposed; United States Department of Energy v. Seneca Oil Company (In re Seneca Oil Company), 906 F.2d 1445, 1450 (10th Cir. 1990) (Oklahoma law governed conditions for imposing a constructive trust).  Three New Mexico cases are particularly on point.

In the first, Garcia v. Marquez, 101 N.M. 427, 684 P.2d 513 (1984), the New Mexico Supreme Court dealt with the imposition of a constructive trust.  In 1940 Garcia and his former wife purchased two lots and a residence in Ruidoso, New Mexico.  Id. at 428, 684 P.2d at 514.  In 1974 he and his spouse deeded the property to his daughter Marquez, the defendant.  Id.  Garcia, his spouse and Marquez continued to reside in the family home until July 1979 when the parents divorced.  Id.  In 1980 Garcia filed an action to establish a constructive trust over his interest in the property.  Id.  The District Court concluded that Marquez's title be encumbered with a constructive trust for herself and her brothers and sisters to the extent of Garcia's one-half interest in the property.  Id.  On appeal, Marquez argued that there was no evidence of fraud, duress, overreaching or similar unconscionable conduct on her part that would require the imposition of a constructive trust.  Id.  The Supreme Court

ruled that such conduct was not essential for imposition of a constructive trust. Id. (citing Velasquez v. Mascarenas, 71 N.M. 133, 140-41, 376 P.2d 311, 316 (1962)). "Other grounds commonly supporting the imposition of constructive trusts are abuse of a confidential relation and unjust enrichment." Id. (citing Flanagan v. Benvie, 58 N.M. 525, 273 P.2d 381 (1954); Restatement (Second) of Trusts §§ 2 comment b, 44, 45 (1959); G. Bogert, The Law of Trusts and Trustees §§ 482, 496 (1978)). The Court noted that proof of a constructive trust requires clear and convincing evidence.[4] Id. at 428-29, 684 P.2d at 514-15. It then reviewed the conflicting evidence that had been given at trial and found that it met the clear and convincing standard. Id.

> From the evidence it is clear a parent-child relationship existed with surrounding circumstances indicating the presence of a relationship of trust and confidence between the parties. There was clear and convincing evidence outlining the terms of defendant's ownership and the conditions upon which it was to be transferred to her siblings. Viewing the evidence in a light most favorable to the trial court's findings and conclusions, and in keeping with the tendency of courts to liberally construe confidential relationships, see Restatement (Second) of Trusts, supra, at § 44 comment a; G. Bogert, supra, at § 496, we conclude there was a sufficient basis for the imposition of a constructive

---

[4] In Homes by Marilyn v. Robinson (Estate of McKim), 111 N.M. 517, 519, 807 P.2d 215, 217 (1991) the Supreme Court adhered to the "clear and convincing standard" but "confess[es] to some misgivings about the necessity for and appropriateness of this heightened standard of proof in cases such as this, where the basis for the imposition of a constructive trust does not involve fraud, duress, undue influence, or other form of wrongful conduct, but solely the prevention of unjust enrichment."

> trust over plaintiff's one-half interest in the real
> property.

Id. (Some citations omitted.)

The second case is Estate of McKim, in which the Supreme Court again upheld a constructive trust between a husband and wife. The trial court found that Mr. McKim paid off the loan of Ms. McKim's corporation secured by a parcel of Ms. McKim's real property. The court also found that, in order to pay off foreclosing creditors on another of Ms. McKim's parcels of real property, Mr. McKim borrowed a substantial sum of money. The lenders required, as a condition to making the loans, that Ms. McKim transfer the two parcels of real property to Mr. McKim. 111 N.M. at 518, 807 P.2d at 216. Mr. McKim died before transferring the properties back to Mrs. McKim. Id. at 519, 807 P.2d at 217. Mr. McKim's personal representative (Robinson) and Mrs. McKim disagreed on whether the deeds were intended as a permanent transfer of title or merely as security for repayment to Mr. McKim. Id. at 518, 807 P.2d at 216. The trial court found that the McKims intended that Mr. McKim would hold title to the properties for the benefit of Mrs. McKim and her corporation, and imposed a constructive trust on each property. Id. at 519, 807 P.2d at 217. The court also required that Mrs. McKim's corporation reimburse the estate for the amounts advanced by Mr. McKim to protect Mrs. McKim's interests in the properties but not yet repaid to him or his estate. Id. Robinson appealed,

claiming that nothing justified the imposition of a constructive trust, which he claimed required fraud or "abuse of a confidential relationship and unjust enrichment." Id. at 521, 807 P.2d at 219. He argued that there was no finding of any abuse of a confidential relationship and that there was no unjust enrichment. Id. The Supreme Court disagreed:

> It is true that there was no finding of an abuse of a confidential relationship in this case. However, the court did determine, in a finding undisputed on this appeal, that a fiduciary relationship existed between the McKims during their marriage. Both fiduciary and confidential relationships give rise to duties of trust and confidence and are therefore synonymous for the purpose of determining entitlement to a constructive trust. See Garcia v. Presbyterian Hosp. Center, 92 N.M. 652, 654, 593 P.2d 487, 489 (Ct. App. 1979) (fiduciary and confidential relationships part of same concept). The existence of the fiduciary relationship was all that was necessary to establish constructive trusts over the properties held by Mr. McKim.
> It is well established that a breach of a confidential relationship is not required to establish a constructive trust based on an oral agreement to hold a deed in trust; the mere existence of a fiduciary or confidential relationship is sufficient in certain circumstances to justify imposition of a constructive trust. See Restatement (Second) of Trusts § 44(1)(b) (1957); Restatement of Restitution § 182(b)(1936); 4 G. Palmer, The Law of Restitution § 19.3(c)(1978). This is significant in that it permits the imposition of a constructive trust against the estate of a grantee where, as in this case, the grantee dies before the trust is carried out and there is no indication that he intended to breach the confidential relationship by not performing the trust. See Henry v. Goodwin, 266 Ark. 95, 583 S.W.2d 29 (1979); Steinberger v. Steinberger, 60 Cal.App.2d 116, 140 P.2d 31 (1943); Silver v. Silver, 421 Pa. 533, 219 A.2d 659 (1966). As stated in the Restatement:
>> If the transferee at the time of the transfer was in a confidential relation to the

Page -10-

Case 06-01054-s    Doc 34    Filed 04/11/07    Entered 04/11/07 13:29:42 Page 10 of 16

>             transferor, a constructive trust will be
>             imposed even though the transferee was not
>             guilty of an abuse of the confidential
>             relation in retaining the land. Thus, if the
>             transferee dies intestate without having
>             repudiated his promise but intending always
>             to perform it, his heir will be compelled to
>             hold the property upon a constructive trust
>             for the transferor. A court of equity will
>             not permit the unjust enrichment of the heir.
>        Restatement of Restitution § 182 comment c; see also
>        Restatement (Second) of Trusts § 44 comment c,
>        illustration 3.

Id. at 522, 807 P.2d at 220 (Footnotes and emphasis omitted.)

The Supreme Court affirmed the trial court, finding that the imposition of a constructive trust was proper, and agreeing that the estate would be unjustly enriched if allowed to retain the properties. Id. at 523, 807 P.2d at 221. Of note is the fact that the Supreme Court went from "abuse of a confidential relationship and unjust enrichment" in Garcia, to the simple existence of a confidential relationship with unjust enrichment in McKim.[5]

---

[5] Plaintiff's argues that Sholer v. Carmichael (In re PKR, P.C.), 220 B.R. 114, 118 (10th Cir. BAP 1998) requires "sufficient wrongdoing by the bankrupt in acquiring the property or a fiduciary relationship between the party and the bankrupt." The Bankruptcy Appellate Panel was quoting United States Dep't of Energy v. Seneca Oil Co. (In re Seneca Oil Co.), 906 F.2d 1445, 1449 (10th Cir. 1990). That may have been the state of the law in 1990, but Estate of McKim was decided in 1991 and is binding on this Court. Also, the context of PKR, P.C. was different. In PKR, P.C. a creditor was attempting to establish a constructive trust over estate assets. In our case, we are looking to what a state court would have done if Ms. Garcia had refused to return the property to Parents.

Page -11-

Another lesson from Estate of McKim is that it was the parties' intention at the time of the transfer that was the relevant inquiry. Id. at 520, 807 P.2d at 218. However, "the parties' actions <u>following</u> the transfer are often revealing of the intent at the time of the transfer." Id. (Emphasis in original.)

> The subsequent conduct of the parties is often persuasive of what they intended to accomplish by the transaction. Among the circumstances held to be evidence that they intended to convey title * * * are the following: That the grantor relinquished possession; that he allowed a long period of time to elapse without asserting a claim to the land or exercising any act of ownership over it; that he paid no taxes or incumbrances; that grantee took possession and exercised dominion over the land as owner; that he paid taxes; that he put valuable improvements on the land; that he contracted to sell and convey the land as owner. Likewise, and most relevant to our inquiry, the absence of these or similar factors would tend to show that the parties did not intend to convey beneficial title, but rather to pass conditional ownership or "dry" legal title, leaving beneficial ownership in the hands of the grantor.

Id. (Citation omitted.)

The third instructive case is Aragon v. Rio Costilla Cooperative Livestock Ass'n, 112 N.M. 152, 812 P.2d 1300 (1991). In this case the Supreme Court set out New Mexico law on resulting trusts:

> A resulting trust differs from an express trust in the manner of its creation. It arises when a person makes a disposition of property under circumstances which raise an inference that such person does not intend that the party taking or holding the property should also have the beneficial interest therein, and where the inference is not rebutted and the beneficial

Page -12-

> interest is not otherwise disposed of. Restatement §
> 404; accord Bassett v. Bassett, 110 N.M. 559, 566, 798
> P.2d 160, 167 (1990). Since the person who holds title
> to the property is not entitled to the beneficial
> interest, the property "springs back or results," to
> the person who made the original disposition or to that
> person's estate. Watson Truck & Supply Co. v. Males,
> 111 N.M. 57, 59, 801 P.2d 639, 641 (1990). In the case
> of a resulting trust it is not necessary to show that
> the settlor manifested any intention to create a trust.
> It is necessary to show the absence of any intention to
> give the beneficial interest to the transferee. In
> that case the settlor presumably intends to retain the
> beneficial interest, or it may be inferred that the
> settlor would have formed such an intention had the
> settlor foreseen certain future events. See
> Restatement Ch. 12, Topic 4, Introductory Note at 392.

Id. at 155, 812 P.2d at 1303. One reason for imposition of a resulting trust is the failure of an express oral trust of land due to the statute of frauds. Id.

Turning now to the facts of our case, the Court finds[6] that Debtors and Parents were in a confidential relationship. See Restatement (Second) of Trusts § 2 comment b (1959). Debtors paid nothing to Parents for the deed to the house. The parents did not intend that Debtors take the beneficial interest to the house; rather, they intended that Debtors take bare legal title for a short period of time to allow them to use the house as collateral. Had Debtors failed or refused to return the house, Debtors would have been unjustly enriched. A state court would

---

[6] The Court makes the following additional findings as proven by clear and convincing, uncontroverted, evidence.

Page -13-

have imposed a constructive trust in this case and ordered a return of the property to the Parents.

A similar result is obtained by examining the McKim factors. Parents never relinquished possession. Teodoro immediately demanded a return of the Property in 2004 when he discovered it had not already been returned; he was not guilty of allowing a long period of time to elapse without asserting his ownership rights. Parents paid the property taxes and insurance during the time title was in Becky. These factors demonstrate that the parties did not intend to convey beneficial title, but rather only to pass conditional ownership or "dry" legal title, leaving beneficial ownership in the hands of the Parents.

Similarly, an application of Aragon to the facts of this case mandates the same result. The warranty deed to Debtors was executed under circumstances which raise an inference that Parents did not intend that the Debtors taking or holding the property should also have the beneficial interest therein. The facts demonstrate that Parents were "loaning" bare legal title to Debtors for a very limited period of time for a very limited purpose, with the expectation that the property would be promptly deeded back.

Parent's interest in the property is also not subject to attack under Section 544. They continuously lived on the property, which gave constructive notice of their claim. See

Page -14-

Crowder v. Crowder (In re Crowder), 225 B.R. 794, 797 (Bankr. D. N.M. 1998); Conway v. San Miguel County Board of Education, 59 N.M. 242, 249, 282 P.2d 719, 724 (1955); Nelms v. Miller, 56 N.M. 132, 156, 241 P.2d 333, 349 (1952). See also In re Keenan, ___ B.R. ___, 2007 WL 901885 *6 (Bankr. D. N.M. 2007)(Section 544(a)(3) cannot be used to avoid interest of one in actual possession of a property.)

In conclusion, the Court finds that Debtors did not have an equitable interest in the property. Under Bankruptcy Code Section 541(d)[7], had the property not been returned, Debtors would have had bare legal title only. Both Sections 547[8] and 548[9] require a transfer of a debtor's property. In this case,

---

[7]That subsection provides:
Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
11 U.S.C. § 541(d).

[8]Section 547(b) states, in part: "the trustee may avoid any transfer of an interest of the debtor in property..." (Emphasis added.)

[9]Section 548(a)(1) states, in part: "The trustee may avoid any transfer ... of an interest of the debtor in property..." (Emphasis added.)

Page -15-

Debtors did not transfer an equitable interest in property, only bare legal title. Because the Court finds for the Defendants on the basis of constructive or resulting trust, the Court need not address the arguments relating to the validity of the warranty deed. Judgment will be entered for the Defendants.

                                                              Honorable James S. Starzynski
United States Bankruptcy Judge

copies to:

Thomas G Rice
500 4th St NW Ste 230
Albuquerque, NM 87102-2106

Bonnie Bassan Gandarilla
Moore, Berkson & Gandarilla, P.C.
PO Box 216
Albuquerque, NM 87103-0216

Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608